UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| **LORNA REID** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 22-CV-449 |
| | § | |
| **REMARKABLE HEALTHCARE, LLC; REMARKABLE HEALTHCARE OF CARROLLTON, LP; and REMARKABLE HEALTHCARE OF FORT WORTH, LP,** | § § § § § § | JURY DEMAND INCLUDED |
| | § | |
| **Defendants** | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff, Lorna Reid, brings this action against Defendants Remarkable Healthcare LLC, Remarkable Healthcare of Carrollton, LP, and Remarkable Healthcare of Fort Worth, LP, for wrongful termination of employment under the federal False Claims Act and the Age Discrimination in Employment Act, and would show this Court as follows:

### I.   PARTIES

1. Plaintiff Lorna Reid is a citizen and resident of Denton County, Texas. She was employed directly by Remarkable Healthcare of Fort Worth LP, as documented by her tax records.

2. Remarkable Healthcare, LLC, is believed to be the parent company that operated Remarkable Healthcare of Carrollton, LP, and Remarkable Healthcare of Fort Worth, LP, as the general partner of the Remarkable Healthcare of Carrollton, LP, and Remarkable Healthcare of Fort Worth, LP, as limited liability partnerships. Plaintiff received her pay

**PLAINTIFF'S ORIGINAL COMPLAINT - Page 1 of 12**

checks from Remarkable Healthcare of Fort Worth, LP.  Plaintiff worked at the time of her termination at Remarkable Healthcare of Carrollton, LP.  Plaintiff alleges Remarkable Healthcare, LLC, Remarkable Healthcare of Carrollton, LP, and Remarkable Healthcare of Fort Worth, LP, are jointly and severally liable as a single common employer, as joint employers, and/or one or more are individually liable for their actions as Plaintiff's employer. Collectively, Remarkable Healthcare, LLC, Remarkable Healthcare of Carrollton, LP, and Remarkable Healthcare of Fort Worth, LP, are referred to in the singular as "Remarkable Healthcare."

3. Defendant Remarkable Healthcare, LLC, is a for profit company limited liability partnership, chartered under the laws of the State of Texas, and may be served by delivering citation to its registered agent:

> Laurie B. English
> 904 Emerald Boulevard
> Southlake, TX 76092 USA

4. Defendant Remarkable Healthcare of Carrollton, LP, is a for profit company limited liability partnership, chartered under the laws of the State of Texas, and may be served by delivering citation to its registered agent:

> Laurie Beth McPike
> 904 Emerald Boulevard
> Southlake, TX 76092 USA

5. Defendant Remarkable Healthcare of Fort Worth, LP, is a for profit company limited liability partnership, chartered under the laws of the State of Texas, and may be served by delivering citation to its registered agent:

> Remarkable Healthcare

904 Emerald Boulevard

Southlake, TX 76092

## II.     JURISDICTION AND VENUE

6. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as these claims are brought under federal law under the Federal False Claims ACT (FCA) and the Age Discrimination and Employment Act (ADEA).

7. Venue in this district is proper under 28 U.S.C. § 1391(b) because Plaintiff was employed in Denton County.

8. Remarkable Healthcare is an employer within the meaning of the FCA and the ADEA.

9. Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) against Remarkable Healthcare within 300 days of Defendant's discriminatory conduct, has received a Notice of Right to Sue letter from the EEOC, and timely brings her ADEA claims within ninety (90) days of receiving her Right to Sue Letter.

10. Based on the foregoing, all jurisdictional prerequisites to this suit have been met.

## III.     FACTUAL BACKGROUND

11. Ms. Reid was hired by Regional Manager Arlene Harrison in November of 2014 for a PRN position. Ms. Reid transferred from PRN to a full-time employee on January 26, 2015. At the time she was hired, Ms. Reid was 58 years old. Notably, Ms. Harrison no longer works for the company.

12. At the time of her termination, Ms. Reid's supervisor was Director of Rehabilitation, Robert Ortiz. Mr. Ortiz has previously had allegations of improper harassment

filed against him by Columbus Robertson. Indeed, Mr. Ortiz's management style is to target weaker people until they cave. He intimidates lower ranking employees and rules by fear through threatening his employees verbally or by text. These threats are that the employees will be suspended, terminated, and escorted out of the building or even removed by police for criminal trespass. One such text message sent to a group of professional therapists was sent on June 28, 2019.

13. On August 22, 2019, during a discussion regarding a patient's progress between Mr. Ortiz and several therapists, including Cherise Austin, Nancy West, and Ms. Reid, Mr. Ortiz started yelling at Ms. Reid, "Really! No Change! Just came back from the hospital weak and no change!" He then stated, "I think you are getting old and need to retire."

14. Ms. Reid was shocked but not surprised. Neither of the other therapists said anything about it, but both just looked at Mr. Ortiz in shock. Ms. Reid reported this incident to Human Resources and also showed HR some inappropriate text messages. However, nothing ever came of the complaint. Ms. Reid was told that it was because Remarkable Healthcare needed Mr. Ortiz too much to discipline him.

15. During this timeframe, Ms. Reid had noticed that many patients were complaining that they were not receiving their occupational therapy from Ms. Austin. As a COTA, following up on prior treatments from the Occupational therapist was directly in the realm of Ms. Reid's duties. As this was occurring, she also noted that Ms. Austin had charted the therapy as having occurred. Ms. Reid properly understood that charting and billing for work that is not performed is Medicare/Medicaid Fraud. Accordingly, Reid repeatedly reported that Cherise Austin was charging Medicare/Medicaid for time spent with many patients whom she had not actually treated; in particular, she reported these events on September 5, 6 and 9 of 2019. Previously she

had reported such events to Mr. Ortiz, but he had not taken any action. Accordingly, Ms. Reid was forced to go outside her chain of command because her chain of command did nothing.

16. On September 9, 2019, Mr. Ortiz told Ms. Reid that he had been instructed to fire Ms. Austin. On September 10, 2019, prior to Ms. Austin's actual termination, Mr. Ortiz came into the gym where Ms. Reid was working and began yelling at her in front of co-workers Nancy West and Janette Alfaro, and in front of their patients. He yelled loudly and pointed at Ms. Reid in anger regarding her participation in the termination of Ms. Austin. This conduct makes it clear that Ortiz blamed Ms. Reid for Ms. Austin's termination and held it against her.

17. Later that day, Ms. Austin was terminated for her Medicare fraud. However, that did not end Mr. Ortiz's anger at Ms. Reid. No, Mr. Ortiz was not happy about Ms. Austin's termination because he considered Ms. Austin a friend. He was upset both that she got fired and that he had to personally terminate her. Accordingly, he took it out on Ms. Reid by giving her a written warning on September 13, 2019, for her actions in not following the chain of command when she reported Ms. Austin's Medicare fraud. As with Mr. Ortiz's prior discriminatory age comments, Ms. Reid complained this write up was improper discrimination.

18. Several months later, during the week of March 23, 2020, Sarah Gosnell, RN, and acting CEO, came to the Prestonwood/Carrollton facility to share lunch and discuss COVID-19 safety precautions. During this discussion, she expressly told each employee that she had an open-door policy and that any of the employees could call her, text her, or come by her office at any time with questions.

19. Because of COVID-19, many patients were being treated in their rooms and not in the gym. On Wednesday, March 25, 2020, Ms. Reid went to Mr. Ortiz's office regarding the treatment of a patient. He was not in, but while Ms. Reid was walking to his office, CEO Gosnell

came out of an office, saw Ms. Reid, and asked if there was something she could help her with. Ms. Reid informed her that the gym was vacant and that she wanted to bring her patient there for treatment. At that time, a spontaneous discussion regarding gym scheduling ensued, and Ms. Reid and CEO Gosnell determined that a time schedule for the gym could be created that prevented patient overlap. This would allow use of the gym and also provide for time to disinfect the gym to maintain a more complete schedule while preventing the COVID-19 from spreading. CEO Gosnell ended the conversation by stating that it was a "good idea and to leave 15 minutes between to clean up after each patient." Excited about the new concept, Ms. Reid immediately went back to the gym, told PTA Janette Alfaro about the discussion, and quickly made an Excel spreadsheet for scheduling purposes.

20. However, as Ms. Reid was finishing the document, Mr. Ortiz came into the gym. As Ms. Reid began to explain her conversation with CEO Gosnell, Mr. Ortiz became apoplectic, began screaming and pointing at her and objecting that she had not followed the chain of command. He said that he was going to write her up. All this conduct occurred in the presence of Ms. Alfaro. As he left the gym to go talk to CEO Gosnell, Ms. Reid asked if she could go get her patient. Mr. Ortiz exclaimed, "I don't care as Sarah [CEO Gosnell] already said you could, and you went over my head."

21. A few minutes later, as Ms. Reid was treating her patient in the gym, Mr. Ortiz returned and began yelling at Ms. Reid with the patient between the two of them. He was pointing his finger at Ms. Reid and threatening to walk her out of the building. Later that night, Ms. Reid documented the incident to provide it to HR.

22. The next day, Thursday, March 26, 2020, Ms. Reid was given a three-day suspension for not following the chain of command. During her suspension meeting, she handed

the letter documenting the prior day's events to both HR and to Mr. Ortiz. However, he refused to accept it.

23. Ms. Reid was terminated on March 31, 2020 after an alleged HR investigation. The alleged grounds for the termination was not following the chain of command. It is unclear how HR found she violated the chain of command when the acting CEO had publicly declared an open-door policy regarding COVID-19 matters, had been the person who initiated the previously unplanned conversation discussing the gym scheduling idea, and the idea was clearly a COVID-19 matter.

24. Based on these facts, Ms. Reid is certain that she was terminated in retaliation for blowing the whistle on Ms. Austin and/or based on his age animus, and that Mr. Ortiz had continued to maintain his age and whistleblowing animus against her. In any event, the accusation about going around the chain of command is merely a pretext for her wrongful termination.

### IV.   LEGAL BACKGROUND

29. Known as "Lincoln's Law," the False Claims Act (FCA) was enacted during the Civil War to counter widespread fraud by contractors supplying the military. The FCA provides robust protection against retaliation. Specifically, at 31 U.S.C. Section 3730(h)(1), the FCA provides:

> Any employee, … shall be entitled to all relief …, if that employee, … is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against …, because of lawful acts done by the employee … in furtherance of … efforts to stop 1 or more violations of this subchapter.
> *See* 31 U.S.C. § 3730(h)(1). (emphasis added by removal of superfluous language).

30. As the Southern District of Texas stated, the FCA anti-retaliation provision can be triggered "by making internal reports that alert the employer to fraudulent or illegal conduct." *U.S.*

*ex. Rel George*, 864 F. Supp 2d at 606, citing *U.S. ex rel. Sanchez v. Lymphatx, Inc.,* 596 F.3d 1300, 1304 (11th Cir. 2010).

31. Pursuant to 31 U.S.C. 3730(h)(1), an employee who complains of conduct that she reasonably believes constitutes Medicare fraud is engaging in protected activity, and her employer is prohibited against retaliating against her because of that activity if the whistleblower's employer knew she was engaged in protected activity.

32. The False Claims Act anti-retaliation section, 31 U.S.C. Section 3730(h)(2), specifically provides remedies under it that include reinstatement with the restoration of seniority status, two times the amount of back pay plus interest, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

33. In this case, the main evidence to support Ms. Reid's claim comes from the actions of Mr. Ortiz under the so-called cat's paw analysis that has been used in retaliation cases since the United States Supreme Court's decision in *Staub v. Proctor Hospital*, 562 U.S. 411, 415, n.1, 131 S. Ct. 1186 (2011) (approving cat's paw[1] theory under Uniformed Servicemembers Employment and Reemployment Rights Act). Numerous courts have applied a Cat's Paw analysis in False Claims Act and other types of retaliation cases. *See, e.g. Poland v. Chertoff*, 494 F.3d. 1174, 1182-83 (9th Cir. 2007) (FCA); *Armstrong v. The Arcanum Group, Inc.*, 897 F.3d 1283 (10th Cir. 2018) (FCA); *Zamora v. City Of Houston*, 798 F.3d 326, 331-32 (5th Cir. 2015) (holding cat's paw analysis applies in Fifth Circuit to Title VII cases); *Holcomb v. Iona Coll.*,

---

[1] The Supreme Court noted that the term 'cat's paw' derives from one of Aesop's fables, was put into verse by La Fontaine in 1679, and was injected into U.S. employment discrimination law by Judge Posner in 1990.

521 F.3d 130, 143 (2d Cir. 2008) (Title VII); and *Marshall v. The Rawlings Company LLC*, 854 F.3d 368, 370 (6th Cir. 2017) (FMLA).

34. Under the cat's paw analysis, "the impermissible bias of a single individual at any stage of the promoting process may taint the ultimate employment decision ... so long as the individual shown to have the impermissible bias played a meaningful role" in the employment action. *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 450 (2d Cir. 1999). Further, when a supervisor or manager takes actions motivated by retaliatory animus that are intended to cause an adverse employment action and do cause that action, this conduct is sufficient to allow the conclusion that the employment decision, even if made by a different actor, is tainted by the same illegal bias or motive. *Zamora*, 798 F.3d at 332 (holding evidence of supervisor's animus was sufficient to show employer's decision was illegal).

35. In this case, there was immediate retaliatory action by Mr. Ortiz upon hearing that Mr. Reid's complaint had resulted in the termination of his friend Ms. Austin that directly resulted in an improper reprimand of Ms. Reid for allegedly "not following the chain of command" when she had in fact done so until it was silent and continued to allow Ms. Austin's illegal conduct; that is sufficient evidence of retaliatory animus against her whistleblowing activity. Further, that Mr. Ortiz engineered Ms. Reid's termination for the false reason of again circumventing the chain of command when there was an open-door policy at that time is additional indication of his retaliatory animus. Thus, even if it could be asserted that an independent manager or human resources employee reviewed, approved, or separately made the termination decision, Remarkable Healthcare's action is tainted by the animus of Mr. Ortiz.

## V.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (VIOLATION OF THE FALSE CLAIMS ACT)

36.     Plaintiff realleges each allegation set forth in the paragraphs above.

37.     By reason of the foregoing, Defendant proximately caused actual damages to Plaintiff by wrongfully terminating her employment in retaliation for Reid's report of Medicare fraud in violation of 31 U.S.C. Section 3730(h)(1).

38.     Plaintiff has been injured by her wrongful termination and as a result should receive compensatory legal damages and equitable remedies, including but not limited to: double-back pay; equitable reinstatement, if feasible, or front pay if reinstatement is unfeasible; special damages, including: mental anguish; loss of enjoyment life; the loss of benefits in the past and in the future; punitive damages; necessary and other compensatory damages or equitable relief that the Court finds just and/or right under 31 U.S.C. Section 3730(h)(2).

### SECOND CLAIM FOR RELIEF
### (WRONGFUL TERMINATION UNDER THE ADEA)

39.     Plaintiff realleges each allegation set forth in the paragraphs above.

40.     By reason of the foregoing, Defendant violated the ADEA at 29 U.S.C. Section 621, et. seq., by terminating Reid, in whole or part, based on age.

41.     Reid has been injured by her wrongful termination in violation of 29 U.S.C. Section 623, and as a result should receive compensatory legal damages and equitable remedies, , including but not limited to: back pay and loss of benefits in the past; equitable reinstatement, if feasible, or if not, then front pay and loss of benefits in the future; liquidated damages; attorney fees and cost

of court, and any and all other legal damages or equitable relief that the Court finds just and/or right.

## VI.     PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Lorna Reid seeks relief against Defendants, as follows:

A.     That this matter be submitted to a trial by jury on all legal issues and as a bench trial for all issues of equity, and

B.     That Judgment be entered against one or all Defendants:

   1.   Finding that one or all Defendants wrongfully terminated Plaintiff in violation of the FCA and/or the ADEA, by terminating her and/or causing her termination, in whole or in part, in retaliation for protected activity of reporting the Medicare fraud of another employee and/or based on age;

   2.   Awarding Plaintiff legal damages and equitable relief, including: backpay, and/or double backpay, and loss of benefits in the past; either equitable reinstatement with restoration of benefits, or if reinstatement is found to be unfeasible, front pay with loss of benefits in the future; liquidated damages; attorney fees and cost of court; and any other compensable damages or equitable remedies under one or both of these statutes as the Court deems just and right; and/or,

   3.   Finding, as to all claims for relief that Plaintiff be awarded its attorney fees, costs of court, and all such other and further relief in law or equity as the Court deems to be just and right.

RESPECTFULLY SUBMITTED,

*/s/ Eric N. Roberson*

_____

Eric Roberson
Texas State Bar No. 00792803
Kilgore & Kilgore, PLLC
3109 Carlisle Street
Dallas, TX 75204
214-379-0817 Direct
214.969.9099
214.379.0843 Fax
ENR@KilgoreLaw.com
**ATTORNEY FOR PLAINTIFF
LORNA REID**